Page number 25, 1045 et al. MISO Transmission Owners et al. Petition for the Federal Energy Regulatory Commission. Mr. Jones for the Transmission Party. Ms. Porter for the Transmission Party, Mr. Fish for FERC, Mr. Bain for Responding Intervenors, and for Part 2, Ms. Shelton for the Customers, and Mr. Fish for FERC, and Ms. Porter for the Responding Intervenors. That's quite a lineup. We're ready when you are, Mr. Jones. Thank you. Good morning. May it please the Court. I've asked the Courtroom Deputy to reserve two minutes for rebuttal, if possible. FERC can lower rates through Section 206 proceedings, but only at the end of the adjudicatory process and only prospectively. At that point, to account for the fact that customers are responsible for paying the challenged rate until a new rate is fixed, there is a sole statutory refund remedy of 15 months. Here, FERC would not set the rate of 9.98% until 2024, but it seeks to backdate that rate to 2016 and order 111 months of retroactive refunds. Before addressing FERC's notice and legal error defenses, I'd like to zoom out and make two quick points. First, the statutory scheme is not a glitch. It's not a technicality. This is the balance that Congress struck in the 1998 Regulatory Fairness Act. There, Congress specifically decided how to apportion the risk of time in a Section 206 case between customers and utilities. But it is equally evident from the statute that the statutory scheme to work requires FERC to move somewhat quickly and deliberately. There simply is no statutory exception for analysis paralysis. On that note, it may have been perfectly reasonable of the Commission to undertake a holistic review of its ROE methodology after Amera Maine in the New England case. But doing so in the middle of this ongoing adjudication, which is what FERC admits it was, has consequences, and by definition necessarily delays final agency action on any rate that might be reviewed by this court, and therefore there was no fixing of a new rate in Opinion 551. On that note, FERC's notice theory and its legal error theory both in some points rely on the notion that 551 somehow fixed a new rate. We think that's wrong for a number of reasons. First, FERC abandoned a 551 fairly quickly after it would never become final agency action. FERC simply undid it by taking the case back on rehearing within 60 days and then reopening the hearing in the 2018 briefing order. Now, FERC this time before the court calls 551, quote, merely provisional and admits that 551 never reached finality. Well, I'm not sure where that leaves me. I don't know which it is. Either 551 fixed a new rate sufficient under the statute to put parties on notice of what the new rate was, or it was merely provisional and it never reached finality. Now, to state the obvious, 551 set a route. Parties were on notice that the prior rate was not just unreasonable, and they fixed a rate which was not finalized. But there was a rate that was announced. It just ended up moving around a lot. That is FERC's defense, that we announced a route in 551. And I think the key for me, and I'd like to understand your position on this, is whether the treatment is different depending on what period of time we're talking about. Because there's a period of time when a complaint is filed, investigation is going on, we don't know yet what's going to happen. And I guess FERC's position is that's the period that's covered by 206B. And then at the close of those proceedings under the statute, there's a declaration, this is not just unreasonable, there's a fixing of a new rate. And their position is 206B applies to that period. So you can get 50 months worth of refunds for that period. And then is there a different period that starts after the proceedings are concluded and that opinion has been issued about not just unreasonable and here's a rate? And at that point, are we governed by 309, which is much broader? And then under 309 and the filed rate doctrine, are there exceptions for you've been on notice here? Or there's no legal error here, which gets you out of being stuck with the filed rate. So that's kind of the way I'm conceptualizing this and trying to understand whether we have two periods of time that we're looking at. And what applies in each period of time, if you can address that. So as I think of the periods of time, Your Honor, so just quickly on the 15-month period. The 15-month period by statute starts on the defined term refund effective date that's established by the commission. So there's no dispute about what that is. Now, in this case, Congress envisioned the cases may take longer. So at the end of that period, the challenged rate comes back into existence until FERC fixes a new rate. Now, the two periods of time in this case. I'm sorry. So you're saying that even if they announce a rate at the end of these proceedings, that's not the fixed rate? I missed your hypothetical. So in the case where if your hypothetical, Your Honor, was FERC announces a new rate within the 15-month period. Or whatever. At the end of their proceedings, they've announced a rate. They've announced the rate. And so I think their position is 206B applies to that rate. So you can get 15 months' worth of refund. Correct. Anything beyond that, you don't get it because it sometimes takes more than 15 months to get to that point. That's right. And I think their position is after they've fixed a rate, which might not be final, and said that this isn't just unreasonable, then there's authority under 309 to order a retroactive adjustment at the very end of the entire process. At the very end of the entire process. And then coming back to what point, right? So I think the problem that we have is that 551 no more fixed a rate. I mean, it was undone. So can we put the facts aside and just talk about what the law requires? Because that's what I'm grappling with here. And so there seems to be authority for the idea that that first period is what was, what 205B was intended, 206B was intended to address. The 15-month period. The 15-month period. And so I think your position is they're limited by that 15-month period regardless. But I'm just trying to understand what the law requires and what it was intended to do. And it seems like just this legislative history that says the investigation can take a long time implies that first period and not after they've already issued an opinion. So if you can point me to the law that supports your position and tell me what law supports your position. Let me make sure we're joining on this. My colleague is suggesting, and I think you are not, so it's important that you answer the question, that there are two different complaint periods. One starting initially and then ending around 551 and then a new period. So the 206B is no longer in play. We're starting again. That's not your view. I don't think it's the agency's view. Both of you take the view that this is one continuous complaint and the fight is over how much we can give in refunds. Am I right? Yes, Your Honor. There are not two periods and two notions of a complaint. It's one going continuously. And you're saying it's outrageous. It went for 10 years or whatever, and the commission is explaining why it goes the other way. Is that right? Well, I think the customers and the utilities are both decrying the time period. And there's a lot of time periods here, and this case is somewhat complex. I want to make sure I'm being responsive to the question because there are the pancaked complaints, the separate proceedings, and that's not what you're asking about. That's not what I'm asking. So, Judge Pan, I think what I hear you asking is the period that kicks in under 206A is when FERC fixes the new rate. And the great debate here is what does it mean to fix the new rate? Has FERC done that in 551? FERC says, yes, we did. We fixed the new rate. You saw it. It was on the paper. It was 10.32. After that, we can do whatever we want. The question is, the stuff that came after is far beyond correcting legal error as directed, even if we're at AmeriMaine with this case, which it was not. What FERC did after it issued 10.32 and said, that's the new rate, it opened up a paper hearing for three years. It took thousands of pages of additional evidence. It continued the record. Well, it ran into the facts again, right? So, just if 551 fixed the rate and then it went up on appeal and then it came back and FERC fixes a final new rate that now no one is arguing about and says refunds back to the 551 issuance, your position is that's not allowed, right? Well, I have to say a fact here, Your Honor, which is that 551 was never final agency action. FERC took it back. This court never reviewed the 10.32 on the merits. FERC never defended it. If it was a final fixed, if it was a final order, are you, I took you to be disputing that even in that situation, FERC could go back to the 551. We do dispute that. Now, so in that hypothetical, had 551 become final agency action and subject to this court's review and FERC came here and defended both the DCF methodology alone, which is what 551 was based on, and the 10.32 that it resulted, and this court remanded, there's a separate question about what FERC would do with that on remand. But what FERC says is Amera Main, from the other case, told us that we did something wrong in 551. Now, what it did at that point was decided to open the case wide open. It is specifically in the 2018 briefing where it invited the parties to brief any aspect of the ROE methodology at once. So this court would never look at a rate on the merits until the rate set in 559A as affirmed by B in MISO transmission owners. So the notion that somehow 551 is at all statutorily relevant to the rate-setting process, we absolutely take issue with that. FERC never fixed the rate because it abandoned— They can't use 551. The date of 551 is the backdating date. But that's not your problem in this case. I mean, I think what your—my view only, just so you can respond. Your view of 206B, it seems to me, is persuasive. And I think that's why FERC spends thousands of pages in their brief trying to deal with it. It's a compelling argument. The 15 months, no matter what, is the fix. Once this complaint—once this challenge starts, that 15-month period, which is set at the very beginning, you're saying, is set. That's it. And if you order refunds when this is all over, that's all you can order. That's your argument, right? Yes, Your Honor. And that's— They're trying to get around that by saying, but wait, when we get to the remand order, we're going to backdate the issuance to 551. And you're fighting persuasively the—why 551? That makes no sense. They didn't do anything in 551. Here's your problem as I see it. In Mid-Continent, this court specifically, with respect to 569A, said you committed—the Commission committed legal error. They specifically found there was legal error with respect to 569—in 569A, even though there was 551, 559, and 569B. But they focused on one. That's the one case in which legal error was found. You're now running up against a precedent that says normally your view is right, and indeed the Commission pretty much is acknowledging it. Your view about the limits of the refund is right, except in situations where the Commission is responding to a court's order. And that's the Anaheim cases are very, very clearly what the rules are. And in Anaheim, they went you away because they said there was no response there to a court order. Here, there is a response. There is a response to Mid-Continent. I understand your arguments, but they did all kinds of other things, but so what? There is a response to a court order that said in 569A, your approach is unlawful, and therefore you have to respond. We have said in that situation they can respond because otherwise Anaheim says you're right. They can't—they're stuck with the original refund period, and that's it. That's what the law is. But you've got a problem, right? Well, I have a—going with that, Your Honor, so that problem, to the extent it's a problem, gets me back to 569A only. That's 2020, not 2016. And so conceding from the point of argument that this court did find legal error in the Commission's flip-flop on risk premium— No, no, no, wait. Let me tell you the rest of it in terms of thinking it through. Maybe your argument is that they unreasonably picked the backdating date as 551 because it doesn't make any sense. And I think that's not an uncompelling argument. Why use 551 as the date to backdate? In other words, to give a refund that they couldn't otherwise give, they picked 551. Why couldn't they have fixed the date of 569A? Again, I think my argument plays much differently. Had FERC done that, I can only argue today about what FERC did, and that was 2016. But I concede the point that the legal error identified in MISO transmission owners was discreetly addressed by the Commission on remand. In fact, it's a fairly helpful comparison. If you look at the Commission's action on remand for MISO transmission owners, it went in and discreetly repaired the flip-flop on risk premium, and that's it. What it did in response to O'Mara Maine was blow the whole thing open again and have an entire case and take on all this new evidence. But again, what FERC did on the remand order was not go back to 569A, citing this court— No, no, I didn't. But why isn't that the potential remedy here? If you're right, why isn't the potential remedy not that they can't have a different refund period than they otherwise would be stuck with, but why can't they have a refund period that focuses on the Mid-Continent case and the particular case where there actually was legal action taken with respect to all this, which is 569A? That's right. So I think, Your Honor, first of all, they didn't do that, so I'm a little bit of a loss to sort of see what arguments they might mount in support of a decision like that. But again, I think if they went back to that point, we'd have to look at what they said about risk premium. Were they simply responding to the court's directive on remand, repairing that discreet legal error under 309, or were they going further? In 569, they talked a lot about risk premium and said, we'd have to have a lot of adjudication if we're going to keep this up and debate risk premium over and over again. So I think we'd look at it from that standpoint. Had that been the commission's decision to backdate this to 2020, that's the conversation we'd be having about in the papers as to whether or not the backdating directive was lawful or not. But I mean, if you are to win on your starting on the 206B notion, but you realize it's amended here because there is an intervening court decision, and so you don't end up with an automatic win. The question would be, there's an intervening court decision which would justify the commission's backdating. In other words, there's some refund, but not as much as their ordering, but it can't be complete. Why wouldn't that go back for the commission to say, why? How did you pick 551? It doesn't seem to make any sense. And why not, for example, 569A? You're saying you can't blow it off. I have to understand what your answer is. Because your case is not as clean as you want it to be because Anaheim, Exxon, those cases all make it very clear that the 206B rules, which limit the refund, and they're stuck with it. That's it. Fifteen months, that's it. No matter how long it goes on. The B assumes these cases go on forever, and you're still stuck with 15 months, and they're trying to avoid that. But why isn't a return to FERC to say, you know, we don't understand the 551 backdating date. You've got to do better than that. You're just saying they have nothing. I don't see how you can get there. Well, I guess the point I'll concede, Your Honor, that, again, our argument plays much differently in the second four-year period since this court's decision in MISO Transmission Notaries because of the way the commission dealt with it on remand of MISO Transmission Notaries. But to be clear, the win for us today is only that the 2016 backdating directive was unlawful. That's the win for us because that's all we have to argue about because that's what they did. If this court decides that the better median point or the better analysis under the statute given the remand on legal error in MISO Transmission Owners was to backdate to 569A, my clients may have something to say about that at the time. The primary argument in your brief is that FERC can't do any backdating at all. And I think that's at least part of what Judge Edwards is asking you. So what is your legal argument that FERC has no authority to do any backdating at all? And I apologize if I skipped over that piece of it, Your Honor. The thereafter observed, right? We didn't know 998 until 2024. The thereafter observed clauses in 206A and 206B says when you set the rate to be thereafter observed, we must know the rate. That's what we know from Anaheim and Exxon, which says this is a two-step process. That tees up at least the simplified legal question is I think you have to concede that under Tennessee Valley and five or six other cases under the Natural Gas Act that what you just said is incorrect, that we have many cases that say thereafter observed can be treated as the date of the erroneous FERC order when there's a judicial decision saying that it's erroneous. Is that common ground? To an extent, Your Honor, all of those cases, none of them dealt with the specific statutory stricture of this 15-month refund period. I mean, a lot of those cases. If this was a Section 5 Natural Gas Act case, FERC can do exactly what you just described, right? And then this whole case is just about whether 206B makes a difference. And maybe it does. I think that's a good way to think about it. And we do think it does. And to be clear, we're not here arguing that FERC has no legal error correction. I'm trying to understand how temperate you're coming in on this. It makes a difference because our principal case law says it makes a difference. Anaheim, which sets the core rule that you want to rely on, says the NGA cases are different. The strictures under 206B are stronger and firmer, and the rules are different. So if you're buying into my colleague's reference to NGA, you're doing something different than I thought. I thought your answer would be NGA is not in play. We agree that if there's an intervening legal event that the FERC is now responding to, that may give them some authority to do some backdating. But it can't be on NGA grounds. No, I think all I was suggesting in response to Judge Garcia's question was that those NGA cases stand for the fairly unremarkable proposition that FERC has some legal correction authority. But it doesn't, as I tried to explain, it doesn't speak specifically to the 206B statutory stricture because this is a very unusual part of the statute when Congress said this is the discrete remedy. So, again, the last time we were before this court, the commission was trying to make up quite a bit about all of those cases about the general legal correction authority. But trying to bring them into play with this 15-month period is, you know, that doesn't – they want to wash away the 15 months through 309. This is what I want to clarify. Your position is that there is no legal correction authority at all under 206B because the only thing you can do is give a 15-month refund, right? No. No, you just – no. That's your view. You can just answer the question. Let him answer the question. I want to make sure that in answering the question, you are taking account of the 206B case law like Anaheim that says there is what my colleague just – there is the possibility of correction if you're responding to a court order. Right. Now, again, part of the difficulty here is that we've got two separate time periods where it is clear that FERC was doing two very different things. And it's part of what I'm trying to respond to is an argument that they did not make in this sort of, you know, split the baby approach of this 569A. But specifically, on these facts and in this case, we have alleged all along that, no, you cannot use 309, legal correction of authority, simply go back all the way to 551, that this is a thereafter observed scenario and that's how the statute works. And, unfortunately, for all of us – and we stopped litigating the rape here seven years ago. We all want finality. We need a better process here. And we think that discipline and the commission's process would lead to that. Another question. So the Section 5 cases involve refunds, some of them. Others involve surcharges. So if this case involved a surcharge, which transmission owners would be much bigger fans of, is your position that that doctrine carries over or does it not? In other words, will you say that FERC has no authority to order retroactive surcharges in the situation that it can under Section 5 of the Natural Gas Act? Under Section 5 of the Natural Gas Act, can we do retroactive – well, if this case involved a surcharge instead of a refund, will you commit on behalf of your clients that you would not say FERC has authority to order surcharges back to the date of the initially erroneous – I can't, Your Honor. And I think that if we play this out, right, I mean, so obviously when this case goes back to the commission to put Humpty Dumpty back together again, we do need FERC to act on some basis to correct its own legal error here, which is the snowballing effect of this entire case. So, again, the problem with Section 206 is that it – Could you just very much clarify things for us if this case was just about the right date for backdating, as opposed to FERC's authority to backdate in the face of legal error? So are you withdrawing the argument that FERC has no authority to backdate for a legal error? No, I'm not withdrawing the argument.  And, again, we perfectly cleared – the way we pled this was based on what FERC did, which was in 20-4, it said we're backdating to 2016. So that's the ball on the field that I have to pick up and run with. Now, specifically, that – what we've dealt with throughout this case is the justifications that FERC came up with for that backdating. I cannot at this point – they've never argued that they had some middle ground to rely on. So we have said we're going to look at the backdating directive, and is it lawful, is it not, yes or no. And our position has been 24 to 16, no, it is not. No, no, no. I'm sorry. Go ahead. This is a hard question, and I'm sure we'll ask it in several ways to FERC. But one of their theories might be that in the MISO decision, we did say there was obviously an Emera-Maine problem with Opinion 551. And that alone is enough to get us to backdating to Opinion 551. What's your answer to that argument? Well, a number of things. First of all, Emera-Maine had two discrete things that it pointed out. FERC had tried to place the ROE in the midpoint of the upper zone. The court said that was arbitrary and capricious. And it had commingled the Step 1 and Step 2. So they're very discrete legal things, right? So even if we were to assume, as I stated earlier, I think, that Emera-Maine was our case, which it wasn't. The New England case started three years before ours. So we're sort of in the middle of our case when the court issues Emera-Maine. And, again, I don't fault FERC for necessarily picking up Emera-Maine and saying, I better do something about this because I don't want to just get remanded again. That seems silly. The question is, what did they do from that point? They decided to keep the case going, keep it open. And at that point, they were well beyond the 15 months, and they had to know that. And I think that's the problem that we had. Now, whether they could have done something more narrow in response to Emera-Maine, we'll never know. Because they abandoned 551. They enacted 569 and 569A based on an entirely different record that would develop after Emera-Maine. So, again, to the extent that Emera-Maine came in and was influential, it only was the nail in the coffin of 551, which FERC now says is the linchpin for its backdating directive. But anything that happened after that point, though, was to correct legal error. That's kind of the point. That's FERC's argument. We absolutely disagree with that. In fact, if you look at the record of the briefing order itself, it says we're opening up all aspects of this. And then you'll see statements from one of the commissioners in 569A and the dissent, which is going on and on about all the things that the commission did beyond. They also did other things. But they didn't. They didn't do this, at least in part. That's their case. And, again, we don't buy it, but that's what they're arguing. Now, I think the critical piece, though, is if you look at what they said, what they're arguing in their brief now, they're not saying. The last time they were here, they were saying that everything in response to Emera-Maine was legal error correction. Now they're saying we want the ability, it's in their brief, to do more on remand from this court than legal error correction. And then as long as they get the case back, they can do whatever they want. So let me ask you about that, because in addition to the legal error sort of exception to retroactive correction, there's also this idea of notice. So in Oklahoma Gas, we said the filed rate doctrine, which I guess stands in for retroactivity, does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service. And so if you apply that idea that there can be error correction as long as there's notice, like you were not properly relying on the prior rate because you had notice it was going to change, then it seems to me that the 551 ruling puts you on notice. We've said this is not just reasonable. We're going to change it. You're on notice it's going to change. We don't know exactly where we're going to land, but you're on notice. So why doesn't that affect your ability to succeed here? Sorry. A couple of quick things. First of all, Oklahoma Gas, that quote, and I can't remember off the top of my head, that was from FERC's brief. I would urge the court to go back and look at it in context. No, no, I understand it. But what the quote of that case, and I was in it, I had a client that was on the unfortunate side of the equities in that case. When this court said no equitable, the filed rate doctrine holds. And even though my clients in that case were on notice of certain things happening, that was not sufficient. The statute, this court held to the statute in that case. I thought it was a very curious citation by FERC to rely on Oklahoma Gas. But even if notice generally can be applicable at some point, what FERC is saying is that the 2018 briefing order is the thing that gave us the notice. Well, that's not the backdating date. They're backdating to 2016. So even if we assume – Why didn't the actual issuance of the 551 order put you on notice that this rate is going to change? It by definition did not. FERC said the order is 551 issued. The rate is 10.32. They did not say we may change it later. That does come until – They said the prior rate is not just unreasonable. So you knew that it wasn't going to be that rate. And they said a rate. But then I think you knew there was going to be verification about that rate. In fact, you instigated some of it. So clearly that could change. How could you not be on notice at that point that this rate is changing? Well, the rate, even if we assume for the sake of argument that the moment 551 issued that everyone was on notice that it may change, even though that's not what FERC says in its brief as to what the relevant notice provision was, the question then comes still back to the statute. Notice of what? If the commission is going to change its rate, then it still has not yet fixed a rate to be thereafter observed. The fact that the commission may – it keeps calling this rate now that says it was provisional. Well, okay, it was provisional subject to what? It didn't lay out any procedures at that point. It just said, I'm going to have a new hearing. In the next four years, have a hearing. So nobody knew where the rate was going to go. So to suggest that somehow because it issued a rate, and that is the crux of FERC's decision, we did something. And that something was good enough. And we say under the statute, no, it was not. Fixing a rate to be thereafter observed that we can all – that gives the customer certainty, gives our investors certainty, has to be an observable rate. And they abandoned the rate. They abandoned the methodology soon after 551 issued. So to the extent that there was going to be ongoing litigation, we were all on notice that there was going to be proceedings to follow, but certainly not on notice of what the rate was going to be. So, again, the notice doctrine, and I'm not going to spend time on general issues. I'll rely on my briefs on that. But I'm well over your honors, but if there are other questions, I will. Thank you. Thank you. We will give you – did you ask for three minutes for rebuttal? Had you asked for three minutes for rebuttal? I believe I asked for two. Two. We'll give you two then. Thank you. All right. Ruth Porter. Good morning, Your Honors. Ruth Porter on behalf of the transmission owners, petitioners. I would like to reserve one minute for rebuttal. Given the common parties, issues, evidence, and rates in this proceeding, FERC exceeded its statutory authority in Section 206B of the Federal Power Act by entertaining a second complaint immediately upon the expiration of the 15-month refund period provided in the statute. The second complaint here was filed the day after the refund period for the first complaint expired by active participants in the ongoing first complaint proceedings, challenging the same rates on the same basis, and even using identical evidence that was presented in the first complaint proceeding. Can you please address why you have a redressable injury for standing purposes for this argument? Yes, Your Honor. Because of the fact that you won on the second complaint. Indeed. So, despite winning on the second complaint and FERC ultimately not ordering refunds, the transmission owners were nonetheless harmed and there is a redressable injury here due to the procedural injury that is inflicted on the transmission owners going forward. So, to the extent that FERC found that this complaint was sufficiently distinct to permit a new 15-month refund period, there is no longer any basis for there to be a 15-month refund period, first of all. But, second of all, it will invite… So, we can't order FERC to refund your litigation expenses. So, the argument has to be something like it is sufficiently impending and obvious that we will face a similar second complaint in another proceeding. Correct. So, the legal rule is so important. Correct. And what facts do we have to believe that you are under such imminent threat? I think not only… Certainly a possibility. Yes, not only in this case, but I think that there is also a record that the amicus, for example, I think was subject to multiple successive complaints. So, this is sort of a perennial issue at FERC, especially when dealing with these return on equity cases. So, it is, I think, fair to presume not only on this record, but many others, that this issue will re-arise. And at that time… Why can't you raise that issue when it re-arises in another case? Certainly, Your Honor, we can, and I presume we will. But in this instance, we were harmed in that we were subjected to the additional time expense burden associated with litigating a second complaint. But as I see it, you are not asking to be refunded for those litigation expenses. Correct. How is this redressable? It would be redressable by an order by Your Honor's finding that the successive complaints were, in fact, barred and should not have been. How did that redress your injury? Because you said your injury was you had to, I guess, spend money to defend. Right. Well, fair enough, Your Honor. FERC does not have authority to refund us our litigation expenses. So, in that regard, you are correct. However, this case, this issue, again, I believe that the International Brotherhood case stands for the proposition that this ongoing procedural costs that are being imposed upon a party are sufficient to show injury. And that would be redressed by a finding that it was FERC illegally. Thank you very much. May it please the Court, good morning. Jared Fish for the Federal Energy Regulatory Commission. Over the last six-plus decades, this Court and the Supreme Court have consistently held that where the Court determines the Commission has committed error in its ratemaking, the corrects the error at the date the Commission originally fixed the rate in that proceeding. The transmission owner's contrary rule would mark a dramatic split from that six decades worth of precedent. It is inconsistent with the notice exception to the filed rate doctrine, and it would deprive consumers of refunds, which is exactly the opposite of what Congress intended when it enacted Section 2016. So if I could begin with the question over assuming that we can backdate the rate to some date, why couldn't we just backdate it to the date of Opinion 569A? Well, a couple reasons. First, in its 2022 Mid-Continent decision, this Court vacated all of the orders in this proceeding. There is nothing left on the books. So that means that the only rate that remained was the 12.38% rate that was the subject of the first complaint proceeding in 2013. So that would mean that if the Commission were to backdate this new 9.98% rate to any date after 2016, that 12.38% rate would have to come back into effect, which we deemed unjust and unreasonable. This Court never found any error with that determination. That doesn't follow. You're taking everything into account now because the Court has said you made legal error with respect to 569A. How can you argue that the Commission is somehow limited now in thinking about the correct rate and the backdate date? You certainly have free reign to exercise your discretion at that moment with respect to the backdate date, and I don't know what would cause you to go back to 511 or 551. There's nothing. It's a reasonable exercise of discretion. The law surely allows you, under the law as we've stated it, the law allows the Commission, when it's been reversed because of legal error, and you have that here, to go back and to think about it again and to get it right. Yes. Yes, Your Honor. That leaves all options open, but they have to be reasonable. And to go back to the date you picked, and this is a question I'm raising, I don't see how you got there because it makes no sense. The error was found with respect to 569A, and there are cases that say that's the date you use. You use the date when the Court says you committed the error. Well, with respect, Your Honor, all of the cases say that we backdate to the date the Commission originally fixed the rate in the proceeding that the Court ultimately reversed. Well, let's look at the other cases because I have cases that say you go back to the date of the error. Well, with respect, Your Honor, in Mid-Continent, this Court conceivably could have vacated only Opinion 569A. See, that's what I'm getting. So what? They vacated everything. I can understand this. Let's just get rid of all of it, and then they'll just get it straight. I don't know what that adds for you. I don't know what that's getting for you. Well, because the law you want to apply, which you're pressing so hard in your brief, is we're responding to a court order. That's what allows us to avoid 206B. That's your argument, and you're doing it every which way you can imagine. I laughed as I read it. You're coming in every conceivable way. But that's your argument. We're responding to the Court's finding of legal error, and therefore we have the opportunity now to get it straight. So, I mean, you have to have a reasonable pick as to the date. The backdating has huge consequences. There are a lot of years we're talking about here, and both sides are raising compelling arguments about that. Well, I agree with you, Judge Edwards. We are certainly responding to the Court's decision in Mid-Continent, and part of that decision was its choice of remedy, and that remedy was to take us all the way back to And the inherent nature of vacatur is that the agency begins afresh, anew, back in the position that we were originally in. So, what we had to do, by way of this Court's order and by way of our authority to correct errors determined by this Court, was to take the 2013 complaint as we found it. We used the exact same study period, the first six months of 2015 that we did back then, and we had to decide anew, as of 2016, what would the correct rate be, 9.98%. And I think it's telling that the transmission owners don't need—they don't quarrel with the 9.98% rate at all. Now, Judge Garcia, I think you got at a really important point that it would be a hype of irony if in enacting Section 206B, which Congress clearly intended to benefit consumers, that our ability to correct errors to the benefit of consumers, when Congress never expressed any intent of doing that, yet, if this were the reverse, where the Court in Mid-Continent found that the rate we had set was actually too low, that the transmission owners could recoup 10 years' worth of undercharges. And that's— Well, I also happen to think that's a decent point, but it goes to the question of whether there's backdating authority at all. And let's just focus on Judge Edwards' question, which is a good one, about what the right backdate is. Does it factor into your analysis, and could it have factored into our remedy in MISO, that although we didn't have the Emmer and Main issue in front of us, that opinion says, basically, there was obviously an Emmer and Main problem with Opinion 551. Is that relevant, or is that not relevant? It's relevant. And at the end of the day, I think it's cumulative. I think it's cumulative of the fact that this Court in Mid-Continent vacated all of the orders dating back to 551. But if there's any question that backdating to 2016 was correct, then I think Emmer and Main is the nail in the coffin on that point. And I'll note, in this Court's 1993 decision, Public Utilities Commission, there, too, the Court affirmed the Commission's decision to backdate it was a gas refund policy that a Court in a separate proceeding had deemed unlawful. Under the Natural Gas Act? Under the Natural Gas Act, sure. But it's all about error correction. This Court has never distinguished the Natural Gas Act from the Federal Power Act when it comes to determining the scope of the notice exception to the file rate doctrine. And the Commission's authority should correct errors. Mr. Bernal made it very clear in Anaheim, which is one of the animating cases that should affect how we think about this, he made it very clear that the NGA is a different set of requirements because of 206B. Well, with respect, Your Honor, in just having... You can't look at them the same way because the 206B requirements are more stringent. I believe City of Anaheim draws a distinction between Sections 205 and 206 under the Federal Power Act, which is the analog to distinguishing Section 4 and Section 5 of the Natural Gas Act. And there, the issue was, look, in Section 205, there's a different procedure. And so the Commission could not bootstrap in Section 205 cases in a Section 206 proceeding. However, the key distinguishing fact of that case that this Court drove home in its 2017 Louisiana Public Service Commission decision was that City of Anaheim did not involve error correction, where the Court had reversed the Commission's rate judgment. And that was the second basis that Judge Kavanaugh identified for when the Commission may backdate a rate, when we are responding to a judicially determined error, which is exactly what we were doing here. And I just don't... I think it would be... I keep asking if the judicially determined error pertains only to... You keep saying there were several cases that were vacated, but the judicially determined error pertained only to one of those cases, and there was a date connected with it. You were doing all kinds of things during this period, but the judicially determined error, which is what you want to rely on, only refers to, what is it, 59As? Well, I think another way to look at it, Judge Edwards, is that petitioners, the transmission owners, and consumers groups challenged every order in this proceeding. So they were challenging our determinations in Opinion 551, in 569, in 569A, and 569B. So if we had just backdated a new rate to, say, 569, well, that creates a really odd circumstance where... No, really. I could have written that easily in a heartbeat. The court... I can give you the language from the court saying, this is the error we're finding. It's only in 569A in which they're saying that. But the court... That's the date. And then there are cases that say we backdate to that point. The backdating remedy is huge. I can find no reason to go back to 551.  Well, the court only found an error with 569A because that was the latest pronouncement of what the proper rate should be. So the court didn't have an opportunity to say whether we got it right in 569 or 551 because the commission, by way of the rehearing process, had changed the rate. So to say that we go back to 569, I would argue is arbitrary and capricious because that would mean that we would be setting a new rate that was challenged before this court that the court never actually ruled on whether that rate was lawful in 569, the 9.88% rate. And that doesn't work. And actually, that's not... It's a matter of the lawfulness of the rate with respect to miscompetence about methodology. That's where you lost with miscompetence. Which determines the rate. I mean, the rate is the rate. The rate is the product.  Well, the... That's what the issue was. And they said, the court said, but only with respect to 569A, that you committed legal error there. And so that should be the focus points. There were other places they could have gone. They didn't. They focused on 569A. So I don't know how you get to 551. I don't know how that date imports your position. You agree that if you're responding to legal error and you're backdating, you agree that as a matter of law, that your choice of the backdated date has to be reasonable, right? Absolutely. Okay. I don't understand what's reasonable about 561. I'm sorry. I keep messing up the dates. 551. Other than it was the first in the line of cases that Mid-Continent knocked off. Because, Judge Edwards, we found that the 12.38% rate that was in effect before opinion 551 was unjust and unreasonable. This court has never disputed that. And this court in Mid-Continent vacated all of our orders back to 551. So if we were to backdate a rate to any time after opinion 551, any time after September 2016, that 12.38% rate would spring back into effect, which we found was unjust and unreasonable. So it would be unreasonable to backdate to a date that is any time after 2016. If I can focus on, Judge Pan, you identified the two different time periods here. And I think that is really the nub of it. There are two exceptions to the Filed Rate Doctrine at play here. One of them existed before 1988. The other one only came into existence with the 1988 Regulatory Fairness Act amendment. So the notice exception to the Filed Rate Doctrine, which is well established in this court's precedence, well established in the 1965 Supreme Court United Gas case, finds that when we set an initial rate, in the words of this court from Natural Gas Clearinghouse, that rate is essentially provisional. And Mr. Jones effectively acknowledged that point when he said that 551 was not final agency action. And I'd agree with that. It's a provisional rate because it's always subject to rehearing and judicial review. So as I think you were alluding to, Judge Pan, there was always notice to the parties in this case that the rate might change, that the initially determined rate in 551 might later be determined to be in error. And as this court explained in- I asked about, so, is the theory that basically any time for issues of 206 order, finding an existing rate unjust and unreasonable, you are- all parties are on notice that that is subject to change until administrative and judicial review is exhausted? Yes. Okay. Yes. So when it is not final in that sense, I don't want to get confused about what's final agency action and what's provisional. Right. We're talking about a 206 order that is still subject to further litigation.  And your position is if it remains subject to further litigation for 1 year, 5 year, 10 years, you can go back to that initial date. Correct. Correct. And that is the inherent nature of error correction. I mean, that is what this court means when it says, were the commission not able to take remedial action to correct its errors, rate payers would be irreparably injured by commission errors, and judicial review would be powerless to protect them. That's from this course West Dept decision. That would be the exact result if we were to backdate to any date except to 2016 here, and the 12.38% rate were to snap back into effect, which we deemed unjust and unreasonable. So that notice that you identified, Judge Garcia, that's the first exception to the filed rate doctrine. That rate that you're saying you eventually found to be unjust and unreasonable would snap back into place, that's making much of the record here. This is all happening at the remand order stage. All of this stuff is behind, and now the commission is thinking about, and now we're going to go through the motions and see whether the existing rate is unjust and unreasonable, and then we're going to do step two, and we're going to make the final determination as to what is. So what happened way back is irrelevant to that process, because you're not doing it until, what is it, 20 whatever. It's way after all this has been going on. That's why I don't understand why you're hanging on those five opinions that have all been vacated, when the question is, can you backdate? In other words, can you issue a fictitious date to get more refunds? That's all that's going on here. You want to stick a fictitious date out on the table so that you can get larger refunds than 206B would allow you to give, right? And that's done way later. It's at the remand case stage when FERC looks at all this. Well, I agree with you, Judge Edwards, that we did have to conduct steps one and step two of section 206 again, because this court vacated all of our orders, so we did have to go back to the drawing board. We did have to determine in the first instance whether the 12.38% rate that was the subject of the first complaint proceeding was unjust and reasonable. We did that here in the remand order, so we said, unsurprisingly, yes. Based on the study period from the first six months of 2015 and all the data that we had accumulated, yes. That rate is unjust and unreasonable. And then we conducted step two afresh, just as we're required to do when there's a vacature of our orders, and we determined, okay, we're going to take away the ‑‑ I'm pointing out the methodology, the discounted rate premium, I think. We took out the methodology that this court reversed and found was not adequately explained in Mid-Continent, and we came up with a 9.98% rate at all times. Wait, so I'm making sure my question is in here. At that point, normally you're stuck, because the statute says in the 206A, you set ‑‑ the commission is required to set the refund dates. That's done way in the beginning. Which we did. Yes, you did. That's exactly right. 2013 to 2015. And unless you can now create a fictitious date, as you did, that's all the remedy you can give, these old 15 months. And you've been fighting that, too, because you understand the consequences. And this case law that says, no, no, this came back from a court, and so they have a little bit of freedom here, and they can do some things to up the ante on the refund, which they could not otherwise do, because the refund dates are set as soon as the case starts. Right? Within moments. No, I don't think that ‑‑ Not within the first minute. But on the 206A, would it say you're required to set? Under Section 206B, we set a refund effective date. That's the separate. So it's separate. It's 206B. Is it B or A? It's B. Okay. In any event, you're required to do that. That fixes what you can give.  For that period. And that's the second exception to the file, right? And the statute understands, Congress understood, you may run long, because there are provisions that say what happens in the event that you go beyond the 15‑month period. So Congress understands this could go on for years. But you're still stuck with 15 months as your refund dates. The law is ‑‑ the statute is absolutely clear on this point. And then it says, well, but if you find that the petitioners have done some bad things, then you can change the refund. And it even talks about FERC running long. You're supposed to give reasons when you're running long, because everyone knew you'd run long. But the refund period of 15 months is still fixed. So the only time under the statute that you can get out from under the statute, under 206, is a situation where agency confirms that the petitioners have done some bad things and they were responsible for the delay, and so we're allowed to up the refunds, where we would not otherwise be able to do it. Then the law later on makes it clear in a situation like this where a court intervenes or where a court issues an order, you can respond to that and you've got some flexibility there. There's no precision to that, but I think we all agree it's got to be just and reasonable the way you exercise that flexibility. Why? Because 206B is so rigid in the 15‑month limitations. Congress knew what they were doing to you. They were saying you only have 15 months, and even though it may go on forever, you've got 15 months, that's it. But I think, Judge Edwards, once you acknowledge, correct me if I'm wrong, as I heard you just do, that there is an opportunity for error correction related refunds to some extent, then the Section 206B point simply doesn't get petitioners where they want to go. It can't be that Section 206B and its articulation of the 15‑month refund period actually is antithetical to refunds pursuant to error correction. Now we're all on the same page that both can coexist. I think that's absolutely right. I think the problem is that what you do in exercising that extra authority that you don't otherwise have has to be reasonable. And you can breach the notion of proper exercise of discretion by doing something that makes no sense. Well, as opposing counsel said, we're talking about, and I think he's absolutely right, we're talking about two different time periods, and we're doing two different things in those time periods. And that's exactly correct. Clarifying question about the Natural Gas Act. Two different time periods, complaint to order to, and then order to final order. In the Natural Gas Act, can FERC order refunds for the first period? No. Right. Right. Because we're, and 206B expanded FERC's authority. Expanded it, right. Only in these kinds of cases. So it's actually an added authority? Is that FERC's position? It's an added authority, and Congress gave every indication that it was an added authority. You go back to Representative Moorhead's statement on why Congress wanted to enact Section 206B. How does that help you? Because it's limited. So what is that? They're adding in a way that's making it as rigid as you can possibly imagine. You've got 15 months. That's it. Can't go beyond it. Well, I think another way of thinking about it is there was no refund authority for the date before we fixed a rate, before Section 206B. And what Congress was concerned about was that- Unless you could get to 309. Right, which is where we locate our- Which is a very loose, does not overcome 206B. And 206B, in fact, is quite rigid because it knocks out your 309 argument. Your 309 argument can't survive 206B. 206B, I know you argue otherwise, but 206B is very clear in what the circumstances are and have to exist to allow you to refund outside of that 15 months. And we have said if there's an intervening board authority that sends it back to FERC, that's one of the opportunities. I agree. All I'm saying is doesn't that have to be reasonable? It absolutely has to be reasonable. We did act reasonably here with respect, Your Honor, because if we hadn't- I mean, we were responding to this court's determination, this court's judgment. We thought that we were doing justice, as it were, to this court's decision in Mid-Continent, which saw fit to vacate all of the orders. If this court had vacated only 569A and B, maybe this would be a different situation. But the inherent nature of vacatures is that we had to go back to the drawing board as of 2016. If I could just-I see I'm way over my time. If I could have a mooting thought. What Representative Moorhead said was the whole purpose of 206B, A, was to expand our refund authority in service of bringing some congruity between Sections 205 and 206. Section 205 is incredibly accommodating of utilities' rate choices. So a utility files a new rate under Section 205. The commission can conduct a hearing to decide if it's just and reasonable, but the rate goes into effect while the commission is conducting the hearing. And before Section 206B, a complaining-an aggrieved consumer could challenge a rate, and the commission would open a hearing. But during that whole time that the commission was considering the merits of that complaint, the consumer would get no relief, even if the commission ultimately determined that that rate, that it took years potentially to evaluate, was unjust and unreasonable. And so Congress wanted to provide some symmetry between Sections 205 and 206. Nothing about error correction-related refunds upsets that symmetry. If anything, it fortifies Congress' goal of ensuring consumer protection in what is, by the way, a consumer protection statute. I actually do have one more question. It's about to respond to one of Petitioner's arguments, which is-or at least one idea-is, what you did when you reopened in response to Ephemera, Maine, you went far beyond just fixing that specific legal error. And so I think the argument is, it looks a lot more like you just reopened your investigation rather than addressing some specific legal error. And in some sense, that should disqualify you from getting to rely on a 551 date. Can you just give-how would you urge us to think about that? Yeah, so I have a couple points on that. First of all, the notice exception to the filed rate doctrine, which gives us the error correction authority, that's all about whether- and I think you were getting at this before, Judge Pan-that's all about whether the parties were on notice that the rate might change. Not about what the rate definitely would be after the commission conducts this hearing, but whether the parties had noticed that the rate might change. And that notice transforms what would otherwise be retroactive rate making into effectively a prospective process. So it doesn't really matter, for notice exception purposes, how we go about correcting the error. It's just about whether the parties were on notice that the error might be corrected. What rate might change? The rate that we- You said changing rates. What rate are you talking about? This is one of the questions I have. What rate are you talking about? We're talking about the 10.32% rate that was set in Opinion 551 in 2016. And also, you know, assume that Amera Maine was reviewing Opinion 551 for purposes of this hypothetical. And the court, as it did in Amera Maine, remanded to the commission because it found that we had committed errors. Well, then, we have primary jurisdiction to decide how to go about correcting those errors. We're not constrained to say, okay, you know, the court said we failed to explain this, and that constrains us in some arbitrary way. I mean, our job on remand is to decide in the first instance what is the best way to respond to the court's direction. And I think there would be a separation of powers issue if the court were to say, well, yeah, we remanded to you to look at this again. And we said you failed to explain sufficiently. But we're actually going to go beyond the court's jurisdiction, which is to decide if what we come up with on remand is just and reasonable, and actually tinker with it and decide whether every, you know, jot and tittle of what we did was actually required by the court's remand. That would, yeah, that would broach separation of powers issues beyond the court's review of what our, you know, whether our rates are just and reasonable. Do you think that Miscontinent made a determination that some particular rate was impermissible? Yes. It comes after opinion 551, 569, 569A, and 569B. And then Miscontinent is August 2022. What rate do you think that they were, they were saying the process you use, whatever you came up with, was wrong. The process, not the rate. Well, the two are inseparable because the process determines the rate. You've got four different rates they're looking at. I don't remember Judge Walker saying, well, the one that really bothers me is the 551 rate of 10.32%. That's not what he said. But I think that's my point, Judge Edwards, because the court always only has an opportunity to review what our final determination is in the order on rehearing. And the court doesn't have the opportunity to review the merits of what we did in an inter, you know, in one of the intermediary orders. I understand what you're saying. That's certainly true. But that's the whole point. When then comes time to backdate and create the fiction, why would you go to 511? The court didn't attack 511. Well, we recently. The 511 rate. We recently found it. I said the process you used to read all of these rates was wrong. That's the legal error. Well, the court, the court found that the entire proceeding was infected with error, and that's why it vacated everything. But also Amera Main found that the process we used in Opinion 551 was erroneous. And as this court found in Public Utilities Commission, the 1993 case, error correction still holds even if the court is adjudicating in a different proceeding, but in a way that compels legal outcome that controls in this particular case. So I think it would be helpful for us to just think about the date, which was the September 2016 date, which Judge Edwards thinks is a fictitious date. But the way I read this statutory scheme is that that's an important date because that's the date on which at the conclusion of the proceeding under this section, which is 206B, that's an important date. That's the date that demarcates the first period and the second period. Correct. So 206B addresses that first period until that date in 2016, when at the conclusion of any proceeding under this section, which is statutory language from 206B, that's when that first period ends. And so that 15-month period where you can get refunds, that ends on that date at the conclusion of any proceeding under this section. And then the next period appears to start after that point, and then you have made a determination that this was an unjust and unreasonable rate, and we've fixed a new rate. And any error correction goes back to the date where you corrected the error and found that there was an unjust and unreasonable rate. I 100% agree with all of that. And maybe one other way to think about this is the refunds are different for the two periods. The refund for under Section 206B is to compensate for the delta between the rate that was in effect, the final rate, not subject to judicial review, that rate was in effect since 2002, to compensate for the delta between that rate and what the commission found to be the just and reasonable rate here, 9.98%. The refunds for the period that you identified, Judge Pan, as the second period, those are to compensate for the delta between the 10.32% rate that we set in 2016 and the 9.98% rate that we set in 2024. So even the type of refund is different because it's addressing two different, you know, base rates. It was 12.38% was the base rate for the first part, for the first time period. And it was, as you pointed out, Judge Edwards, variable. It started with 10.32% for the second period. So it's two totally different types of refunds. What's the refund effective date, indulge you? What's the refund effective date that the commission gave when it started what you're calling a second stage with respect to 561? We're still talking about the first complaint? No, no, no. I'm playing your game of demarcation. This is nonsense. This is not what you were arguing in your brief. I read your brief very carefully. So to go with your thesis now, you have to have a refund effective date because you're effectively saying this is a new complaint on 206A and B, and so there's going to be a refund effective date that would limit when you get done with all of this that you've described, you would be bound by. There is none. There is. It was November 12, 2013. And perhaps another way of thinking about this is the two refund periods can never overlap. We set the refund period at the end of our complaint proceeding when we set a new rate, and so we are compensating for the rate that had been in effect that was final for, you know, and comparing that to the new rate that we set. Wait, wait, wait. You said November 12? 2013. That was the refund. That's for the original complaint. Correct. As my colleague is talking about these two different periods, that's in the first period. Right. Okay. You're saying you agree with her that there's a second period now. Forget the first period. So that refund effective date is irrelevant. That means you must have set up a refund effective date at 551. No, respectfully, Your Honor, that's not what I'm saying. Which I totally understand. You have a right to do that because a legal decision came down. But you weren't in a second complaint posture because it wouldn't work for you. Okay. You didn't make the final determination until a long time after. And if you had a refund effective date that you set for 561, you wouldn't have gotten this result. I apologize if I left you with the impression that I was arguing we had two 206B refund periods where we were not. That's what I was asking. No. They're not. There's a single from the beginning to the end. You're just saying, but we can win because there was an intervening legal authority. And we can go in and correct. And you and I are fighting over, fighting respectfully, disagreeing over what's the date you picked in doing that. But there wasn't a second process that started at 561. That was no new process. You're just still ongoing on the original case. And you have argued in your brief consistently we already paid on the original refund effective date. And that's it. All we're doing now is adjusting that arrangement, which is limited by 206B, because we have the authority to do it when there's an intervening legal authority.  And that's 60 years of precedent. Yes. Yeah. Okay. But I want to make sure we're on the same page, because you responded to Judge Pan as if there were two, there are not two separate things going on. It's one. It's just continuous. And it's how do we keep looking at it. Well, I think, right, we have to be careful of how we identify the thing that we're talking about. There is one thing in the sense that this is all one docket, FERC docket. It's all one proceeding. If the things that we're talking about are refunds that are allowed under Section 206B on the one hand, and refunds that are allowed pursuant to our authority to correct errors on the other hand, then we're talking about two different things. Right. You're saying that 206B, your argument has been 206B shouldn't be in play here, because I'm relying on the authority that said there was intervening legal authority that came down, and we can make an adjustment to that original thing. We are not bound by the original refund dates. We're bound by them. We paid them. But we can do more than pay refunds limited to that first refund date. Right? That's what your argument is. And as opposing counsel said, there are two different time periods, and we're doing two different things. And I think that's correct. Thank you, Your Honor. You're still here? We thought you left an hour ago. I don't know if it's good morning or good afternoon at this point. But may it please the Court, my name is Jeff Bain, arguing on behalf of the customer interveners. And I want to make two points on the refund issues, one on the legal standard. But I'll start with what FERC did in its 569 series of order, because I think that gets to why it was correcting error and why the September 2016 date is the right date to put the parties in the position had FERC gotten it right the first time, which is really at the heart of FERC's error-correcting authority. So in Amera, Maine, the Court faulted FERC in the New England case, the merging of the two steps of 206. But the relevant part here is it acted arbitrary and capricious in setting the replacement rate at the upper midpoint based on a discounted cash flow analysis. And that's the exact same reasoning FERC used to reach the number it reached in Opinion 551. So FERC was faced with a choice. It had an indefensible order in 551 that was pending on rehearing. So rather than let that go up on review and inevitably get reversed, it had to reconsider. And it had to either come up with some way to justify that number it previously picked, if that were possible and supported by the record before it, or it had to come up with a new number that was legally defensible. And it went with the latter. That's a common way agencies respond to these kind of deficiencies. And to be clear, transmission owners supported that at the time. When FERC denounced it was going to come up with a new way to set replacement rates and use the 2016 effective date, they agreed with that. They proposed some further tweaks to the methodology FERC suggested to raise the rate even higher. But they argued that replacement rate should go back to 2016. So that's what FERC was doing in Opinion 569A. It was correcting the error this Court identified in Amera, Maine. And that's why it's appropriate to go back to 2016. Because if FERC issued the orders on review today where transmission owners aren't challenging 9.98 as a valid lawful replacement rate, customers would have got that rate back in 2016. And I guess turning to the legal standard, just to be clear from what was on the brief, transmission owners' argument is that they're entitled to the undisputedly excessive 12.38% for the time it takes FERC to correct its errors, the time the Court is dealing with the issue when it's on review, while pending on rehearing while FERC's correcting admitted errors. And that means that customers are actually worse off for successfully challenging FERC's replacement rate. And they get a windfall for FERC's error. And this is hundreds of millions of dollars we're talking about. And that matters not just for this case, but it actually creates really perverse and disturbing incentives for all 206 complaints going forward. It encourages public utilities to prolong litigation. Even if they raise arguments that can't withstand judicial review, they benefit from the time it takes FERC to correct its error. And that's why we have FERC's error-correcting authority under 309 to put the parties in the position they would have been in. That erasure of FERC's error-correcting authority also is really troubling because it discourages ratepayers from challenging plainfully unlawful orders. If, for instance, FERC couldn't go back to 2016, I mean, customers saw a rehearing of 551 because they saw errors. Those errors were vindicated. We went down from 10.32 now to 9.98. It can't be that customers should be discouraged from challenging unlawful FERC orders because of delayed benefits to transmission owners. And there's nothing in 206, there's nothing in 206B that requires that. 206B, I agree completely with FERC counsel, was intended to expand FERC's authority. But equally important is 206 and 206B makes no mention of judicial invalidation. There's no discussion of remand proceedings. There's no discussion of FERC's error-correcting authority. That silence is the same that's in Federal Power Act Section 205. That silence on error correction is the same in those analogous Natural Gas Act provisions. And what this court has said, the Natural Gas Clearinghouse, is that silence means the general rule applies. Of course, agencies have authority to correct their errors on remand, and that's exactly what FERC did here. And, again, to be sure, I don't want this two separate periods to get confused with setting two refund effective dates. It's simply that 206B was intended to address that interim period when FERC has a complaint before it but hasn't acted yet. 206B does nothing to limit FERC's error-correcting authority when it gets it wrong when it sets a replacement rate. FERC has a sample authority under 309 to go back and correct it. And to be clear, 2016 is the right date for FERC to correct the errors this court identified. It shouldn't have had to go up and defend Opinion 551 when it knew it had the same error as this court identified in AmeriMaine. So setting the effective date back to 2016 simply puts the parties in the position they would have been in had FERC come up with a lawful replacement rate in the first instance in response to these complaints. Thank you very much. And so we'll give two minutes to rebuttal to Mr. Jones. Thank you again, Your Honors. Just quickly in the time I have remaining, I'm a little bit dizzy, to be honest, sharing those two arguments because I've heard 551 now described as, quote, indefensible by the interveners, which tells me that it cannot have possibly fixed a rate. And I hear FERC wanting to have it both ways. 551 was provisional. It wasn't done yet. It put parties on notice, perhaps, that stuff was going to happen later. Well, if that was not yet the completion of the process, then it cannot have fixed the rate. And, Judge Pan, I heard you go back to the text of the statute. When you're looking for the conclusion of the proceeding, the hypothetical you laid out may apply in a garden variety case, but that's not this case. And what I mean by that specifically is 551 was not the conclusion of the proceeding. The Commission answered that with the 2018 briefing order. They opened up the case. It was not the conclusion of the investigation. The Commission said, we've got more stuff to look at. We have an open record. We will take all evidence. They're taking the data from that case and taking all the extra arguments in the 2018 case. It is in the same docket. It is absolutely a continuation all the way through. I understand this is all one case. No, I understand. But I heard Your Honor ask the question, when I'm looking at the statute, I'm looking at the conclusion of the proceeding, isn't it 551? I'm talking about for purposes of 206B and the 15-month period. You agree that it addresses the period before the Commission has actually made a decision? In most cases, yes. That's all I'm saying. We agree.  I apologize. I'll move on. Quickly, Judge Garcia, you asked a rarely pointed hypothetical, and the answer tells us, I think, everything we need to know here. You said, to the Commission, can you issue a provisional rate and then wait five and ten years to continue your proceedings? The answer you got back was yes, because that will be legal error. That is what the Commission is asking for here, is basically unfettered, quote, legal error authority. Before a rate ever makes it to this Court, it wants to claim legal error and draw out the Commission's proceedings. The amici in this case have been waiting since their complaint was filed in 2011. We've dictated, or we've detailed, rather, in our briefs, all the delays that the Commission has laid in. I bristle a little bit at the notion that we were responsible for the delays. Thank you, Your Honor. We'll give one minute to Ms. Porter. Thank you, Your Honor. Just following up on a couple points quickly. I believe I heard counsels or interveners note that the transmissioners would have an incentive to prolong litigation, but that issue is fairly addressed by Section 206B. I believe, as Judge Rooks pointed out earlier, to the extent that there is a delay that is the result of the utility dragging out litigation, that is specifically addressed by the statute, and FERC does have expanded refund authority in that instance. And as my co-counsel noted, the delay here was not on the part of the utilities. After the initial complaint, FERC took 11 months before they set the initial complaint for hearing. It was not a case of the utilities dragging their feet and prolonging the proceeding. It was just FERC did not necessarily act with the due speed that was contemplated by 206B. All right. Thank you very much. We'll move on to Act 2. We've got Part 2. All right. We're ready for Act 2, and we'll hear first from Shelton. Good morning, and may it please the Court, Dana Shelton for Petitioner Louisiana Public Service Commission. The Louisiana Commission raises very significant consumer issues, issues that harm Louisiana customers by charging the transmission rates that have been found to be unjust, unreasonable, and therefore unlawful. FERC clearly thinks the Louisiana Commission should not be here today. They've raised numerous issues, preclusion issues, and standing issues, but none of those should prevent the Court from addressing the merits of our claims. First, with respect to standing, there should be no serious question that the Louisiana Commission has standing. The Louisiana Commission articulated standing in its brief on page 16, where it states the basis for its standing, as it has numerous appeals to this Court in FERC matters in substantially the same form. Never before has the FERC complained about our standing or questioned its basis or said it doesn't understand the basis. As stated in our brief, the Federal Power Act, by statute, expressly gives state commissions that are aggrieved the right to seek rehearing of commission orders and to seek judicial review of those orders, as we have done today. We are aggrieved because utilities under our jurisdiction are being forced to pay unjust and unreasonable and therefore unlawful transmission rates for the refund-effective period for Complaint 2, and those unlawfully high transmission rates are passed on to Louisiana's retail electric customers. One example of a utility so aggrieved is DEMCO, an electric distribution cooperative located in Louisiana that delivers power to more rural areas of Louisiana. So could you just move on to the law of the case issues in this case? Okay. To the merits, Your Honor? Yes. Okay. For whether they're precluded by the law of the case. Whether they're precluded. Okay. FERC also claims that on a successive complaint and refund-effective period of the case issues is barred by the law of the circuit doctrine and issue preclusion. They do not spend very much time in the brief arguing either of those or arguing the factors. It just seems that at least two of these arguments were addressed in MISO, like the first 2022 opinion. So I don't know why you get to relitigate them now. Okay. Are you referring to the beta issue, Your Honor? Yeah, it's the beta mismatch issue. Okay. I'll address those briefly. I mean, the most important issue to us goes to the issues that have been discussed on the refund, the refund issue. And that by far is the most important consumer issue in this case. But just to address the beta issues, the first beta issue is the beta mismatch issue that addresses the use of the base model versus the S&P. It's regardless of, I guess, the details of that. Right. Why was this addressed in the prior opinion? And why should we consider it again here? Well, because the prior opinion said there simply wasn't enough data in the  And then the case was remanded, reopened, and remanded to the FERC, which then could consider all of those issues. On remand, the commission demonstrated that there was a material difference from using the S&P betas versus the New York Stock Exchange betas. And that had an effect of 137 basis points in the CAPM model results. That's significant. That's a significant difference when it comes to ROE, significant money. The FERC on rehearing rejected that evidence without explaining why in any substantive way. FERC simply said that The only exception to loss of case would be if there were extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice. Do we meet that standard here? Yes. It's clearly erroneous, Your Honor, because the Louisiana Commission on rehearing showed this material difference between the two data points. And instead of FERC addressing those on the merits, they just said, well, it's an incomplete data set. Never before was the Louisiana Commission told it had to be a complete data set. Our burden in that case was to show by preponderance of the evidence that the existing rate was unjust and unreasonable, which we did. We showed by 29 of 40 companies that it swung the basis points of the CAPM model. At that point, then, and FERC did engage with that evidence. And once they engaged with the evidence, they had to explain why they weren't relying on it in a reasonable, clear way, which it did not do so. FERC can also rely on alternative grounds. And it is brief, but the first thing it says is, we won't allow introduction of new evidence at the rehearing stage. And there's a footnote with all the authority about how this evidence shouldn't have been submitted on rehearing. What's your response to that procedural argument? Well, my response is that the commission said that there was not sufficient evidence in the record. But there was sufficient evidence in the record. And my further response is, once it was remanded to FERC and FERC decided to submit that evidence,  And that issue then became germane in the rehearing process. On the second beta mismatch issue, where the adjusted betas are used in the base CAPM model versus the raw betas used in size premium adjustment. In the prior appeal, this court said that FERC had to choose between a size premium with raw betas or no size premium at all. But that was a false choice. FERC could have adopted to use raw betas in the base model, but it would match the size premium adjustment. That was not previously considered by the FERC. And it was arbitrary and superstitious for the FERC to instead choose to adopt and accept a mathematical error in its ROE analysis. Instead of considering that third alternative. So this evidence of the third option was in the record for opinion number 569. And you could have argued, and maybe you did, on petition in that case, that it was arbitrary and capricious not to use the third option. That's not true, right? Well, in that case, I know our opinion does not explicitly address this issue, but. Right. Your Honor, I'm just, I'm just, what I'm trying to think of is what data was in the record at 569 on this issue. Okay. I don't know. I can't recall right now. Your Honor, I'll have to, I'm sure we addressed it in the brief, but I'll have to leave it to that. I would like to take a minute to address this refund issue. Because as I said, that's a very important consumer issue that really motivated us to bring this appeal and to participate here today. And that is because prior decisions of this court recognize that the FERC can order refunds under QSXB of the Federal Power Act for the difference between amounts paid or charged and the just and reasonable rate. There's a significant conflict with how the court in the prior appeal interpreted section 206A and this court's earlier decisions on section 206B of the Federal Power Act. In the prior appeal, the court said that for 206A, the FERC could impute a just and reasonable rate in place of the unjust and unreasonable rate that was in fact actually paid. This interpretation precluded FERC from ordering refunds for those unjust and unreasonable rates in conflict with earlier decisions of this court. A review of the timeline might be helpful here. I know in the prior argument, there was a lot talked about in the timeline. But for our purposes, we're really focused on that second complaint refund effective period. The second complaint was filed on February 12, 2015. The rate that was being charged to and paid by customers that was challenged was 12.38%. The FERC set the refund effective period as February 12, 2015. And 15 months after that is May 11, 2016. FERC issued a decision on Complaint 1, decreasing the rate in Opinion 551 on September 28, 2016, after the end of the rate effective period for Complaint 2. FERC made that lower rate effective on September 28, 2016. FERC then lowered the rate more in the Opinion 569 line of cases in 2019 through 2020 and made those new lower rates effective on September 28, 2016. Again, that effective date was after the end of the refund effective period for Complaint 2. FERC granted refunds based on those rates for Complaint 1 refund effective period but refused to do so for the rate effective period for Complaint 2. FERC finally settled on the rate of 9.98% in the order on remand issued on October 17, 2025 and made that effective as of September 16, 2016. Again, the Opinion 551 date. Again, that was after the end of the refund effective period for Complaint 2. FERC granted refunds based on those rates for Complaint 1 refund effective period but again refused refunds for Complaint 2 rate effective period. Thus, none of these FERC decisions that lowered the 12.38% rate impacted at all the rates that were charged to or paid by Louisiana jurisdictional customers during the Complaint 2 refund effective period. The rates charged to and paid by customers during that second refund effective period was 12.38%, a rate that FERC determined was not just, not reasonable, and therefore was unlawful five times. The FERC decisions keep that unjust, unreasonable, and unlawful rate in place for the refund effective period for Complaint 2 and find that FERC cannot, in fact, is precluded from fixing it with refunds, in conflict with the requirements of 205A and 206B as was previously interpreted by this Court. The D.C. Circuit has many times stated that refunds for 206B measures the amount paid against the amounts that would have been paid under the just and reasonable rates. None of those cases address this interaction between a first complaint and a second. That's true, Your Honor. That's true. That's a unique issue here. So if MISO resolved this issue against you, you can't really say that holding is contrary to other D.C. Circuit precedent, right? Well, I think we can, Your Honor, because of the way 206A is being interpreted. The way 206A is being interpreted where the fictitious 9.98 rate is imputed, and it was-we're assuming that was paid. Even though it wasn't, it was 12.38. And so based on that, the FERC then said, oh, well, you're in the range of just and reasonable rates. We dismiss the complaint. Well, that's effectively saying you don't get a successive complaint and you don't get a second refund period. That is contrary to what this Court has said, which is you measure refunds based on what was actually paid versus what should have been paid under the lawful rate. And FERC has-longstanding FERC authority says that successive complaints are allowed, especially in ROE cases, and that you can-consumers can come in and file a second complaint. Again, this was all about the symmetry under the Regulatory Fairness Act. Under-because under Section 205, a utility can come in at any time and they can file for a rate increase. And it goes into effect subject to maybe a 60-day notice period up to a five-month suspension period that the FERC can enact but doesn't have to. So a utility is made whole for either everything or maybe just they're left hanging for five months. Well, along comes 206D, and it gives consumers the 15 months' worth of protection. That's really not equal, but it comes somewhere closer to what the utility gets. But another protection that consumers get, especially in the ROE area, is they can file a second complaint and get a second refund effective period. That's what a different group of consumers did with a different witness, a different proxy group, different methodology, and different results. It was a second period, second timeframe, second witness, second analysis undergirding that second complaint. And if you look at how that worked, if it had worked as we are suggesting it should have worked and allowed that second refund effective period, we would have been exposed for four and a half months, which is within the range of what utilities are exposed for. Thank you. All right. Mr. Fish? It's nearly afternoon, so good afternoon, Your Honors. Good to be back. Jared Fish for the Federal Energy Regulatory Commission. If I may, I'd like to start with standing and then move to our preclusion arguments. This court instituted its revised Rule 28A.7 governing the requirements that a petitioner must satisfy in their opening brief to satisfy standing. That rule, while there was some play in the joints before, no longer has any ambiguity. Do you dispute that they, in fact, have standing? You're just standing on this procedural rule and not, in fact, whether or not they have standing? Well, the Louisiana Commission has now said two slightly different things in their opening brief and in their reply brief. So, in their opening brief, the commission stated that the Louisiana Commission stated that the commission's orders would cause certain of their customers to pay increased rates. Well, that simply doesn't make sense because the rate that the commission instituted in the 2024 and 2025 orders here on review is lower than what those customers were paying for the intervening years from 2016 and 2024. Now, in reply, they tweak their argument a bit and say that some of their customers will pay inflated rates, which to the extent that there's a difference, maybe they're arguing that the rates would be lower but for commissionaires. But those are two conflicting statements. And so I think the court, A, to maintain the integrity of its new Rule 28A7 and to hold petitioners to their burden to make a consistent standing argument should find that the petitioners don't have standing. If the court were to find otherwise, then I'm not sure what force revised Rule 28A7 does vis-a-vis the prior rule because petitioners could, if the court finds standing here, not cite evidence in the record, not cite evidence in an addendum to their brief and have standing anyway. And that's exactly the circumstance that I understand the court's new rule to foreclose. Moving on to the claims that we argue are precluded, there are three. One is whether the Louisiana Commission's argument that their second successive complaint was properly dismissed as precluded. It was. This court in Mid-Continent found that it held that we correctly dismissed the second complaint because the operative rate to judge was the new rate that we had determined in the first complaint proceeding. Here, that rate is 9.98%. The Louisiana Commission conspicuously does not argue that that 9.98% rate was unjust and unreasonable for the period covered by the second complaint. So all they're left with is a legal issue that this court already decided in the Mid-Continent decision. There are also the two imperfect correspondence issues. This court already decided both of those. I'll take the first one, which is where we applied the value line adjusted datas from the New York Stock Exchange to market risk premiums determined from the S&P 500. The Louisiana Commission now, belatedly, years later, proffers evidence that they say corrects for that imperfect correspondence by submitting beta data from the S&P 500 on both sides of the equation. But that new evidence is irremediably tardy. First of all, if they wanted to put new evidence before the Commission, we have procedures for doing so. Set forth in our regulations, 18 CFR 385.716. A party cannot end run those record reopening procedures simply by putting new evidence into a rehearing request and demanding that we consider it. They didn't follow that procedure here. In addition, the argument is raised through Dakota Bar because this was an issue that was already decided by this court in Mid-Continent. Louisiana Commission does cite a case from 2022 American Clean Power where the Commission was required to consider new evidence on remand. That case is materially distinguishable because there the court ordered the Commission to create a record on remand. Here, the court did no such thing, and it's well established that it's within our discretion to determine whether supplementing the record on remand is appropriate. Here, they didn't even request that we reopen the record. On the second imperfect correspondence issue regarding whether it was reasonable for us to use a size premium adjustment based on raw datas and apply that to the capital asset pricing model that used adjusted datas, this was an issue that was finally decided by this court in Mid-Continent. All the Louisiana Commission comes back with now, as you were getting at Judge Garcia, is that, well, there was evidence in the record before the Commission, when Opinion 569 was issued, that could have corrected for the imperfect correspondence. But all of that was before the Commission, it was before the court, and the court still found that our determination was rational. And, you know, regardless of whether the Louisiana Commission raised that point in an earlier stage of this proceeding, raised through the Cod of Bars not only claims that were raised, but that could have been raised. There are no questions. Thank you. Thank you very much. Ms. Porter. Good afternoon, Your Honors. Ruth Porter on behalf of an intervener in supporting FERC on limited issues. In this case, as we discussed earlier, we are of the opinion that the Commission should not have entertained the successive complaint in this proceeding. However, to the extent that they did, for correctly denied reasons in this case, and the Louisiana Public Service Commission has given no reason to find otherwise a reverse FERC judgment on these issues. Just quickly, I want to point out, the Louisiana Public Service Commission noted that the intent with the Regulatory Fairness Act was to promote regulatory symmetry. And that is not entirely accurate. Although Congress did empower FERC with limited refund authority, it did not give symmetrical refund authority. Under Section 205, utilities are exposed to limitless refunds. So, they will allow the rate to go into effect. However, it is subject to refund ultimately at the conclusion of the proceeding. Whereas under Section 206, the refund liability is capped pursuant to the statute. And for that reason, we believe that the reading, the best reading of the statute here prohibits successive complaints in cases like this one, where there is no materially changed circumstance. The updated data that is supporting the second complaint is inherent to the first complaint proceeding playing out. And we'll have some questions. Thank you very much. Thank you. Michelle, we'll give you one minute for rebuttal. Yes, very quickly, Your Honor. Thank you. So, with regard to standing, I do think that the 2025 case, NJR Conflict v. FERC, applies here, where the court excused noncompliance with 2887 for good cause, where the petitioner reasonably believed that its opening brief adequately proved standing, or reasonably believed that the standing was self-evident from the administrative record. On the issue of preclusion, the ruling on the refunds from the prior appeal, MISO, TOs, the issue would only be precluded if it was actually and necessarily determined by a court of competent jurisdiction. It was not actually or necessarily determined by that court. And, in fact, the court said, when it is not necessary to decide more, it is necessary not to decide more. That case was decided and remanded solely on the basis of the risk premium inclusion of that model. So, thank you very much. Thank you, Michelle. All right. The case is submitted.
judges: Pan; Garcia; Edwards